UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LENNY DYKSTRA,

        Plaintiff,

        v.

6069321 CANADA, INC., SCOTT SATOV,
HOWARD DVORKIN, and DEBT.COM,

        Defendants,

and

REBOUND MARKETING, LLC,

        Nominal Defendant.

Civil Action No. 1:19-CV-688

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Lenny Dykstra, by and through his attorneys, Pierce Bainbridge Beck Price & Hecht LLP, for his complaint, alleges as follows:

## NATURE OF THE ACTION

1.     Lenny Dykstra is a beloved retired baseball player who is widely admired for his mental toughness, positive energy, loyalty, and tenacity.  In 2016, Dykstra entered into a "Brand Ambassador Consulting Contract" (the "Brand Ambassador Contract") with Defendant 6069321 Canada Inc. ("CMI"), which was owned and run by Defendant Scott Satov.

2.     Under the Brand Ambassador contract, Dykstra was obligated to use his "celebrity status, social media and general media clout" to promote CMI's web-based business, Rebound Finance, where Americans with low or poor credit could learn about and shop for credit products.  Dykstra was also restricted under the contract from marketing financial services for any other entity.

3.     In exchange for his marketing services, Dykstra was entitled to receive compensation in the amount of 25% of the gross revenues of Rebound Finance.  The term of the Brand Ambassador contract was from the date of execution through "Lenny's death may he RIP."  Despite honoring his side of the bargain, Dykstra never received his promised compensation under the Brand Ambassador Contract.

4.     By April 2017, Rebound Finance had trouble gaining traction, and the relationship between Dykstra and Satov had soured.  Refusing to give up on the promise of Rebound Finance, Dykstra proposed an idea to Satov that he believed would not only save the business, but bring it success that Satov had never dreamed was possible: securing a joint venture between Rebound Finance and American Media, Inc. ("AMI"), the owner and operator of the leading celebrity and health and fitness media brands in the country.

5.     Dykstra met several times in Manhattan with a high-level executive of AMI to explain the Rebound Finance business model, and to demonstrate how a joint venture between AMI and Rebound Finance would provide substantial financial benefits to both parties.  In sum, the proposition was that AMI would use its staggering level of internet traffic—generating approximately 750 million page views per month—to run free advertising for Rebound Finance, and both AMI and Rebound Finance would share equally in the profits that Rebound Finance generated in the advertising campaign.

6.     After ultimately persuading the AMI executive that the business model was lucrative and sound, Dykstra met with one of the highest-level executives at AMI to discuss the possibility of the joint venture, and persuaded that executive to meet with Satov.  In doing so, Dykstra ultimately succeeded in facilitating a joint venture between CMI and AMI to promote and share in the proceeds of Rebound Finance.

7.      As contemplated in the negotiations, AMI provided Rebound Finance with free advertising in its online and print publications, thus dramatically raising the profile of Rebound Finance and connecting Rebound Finance to a large and previously untapped source of customers.  The  advertising campaign increased the visibility of Rebound Finance to a level Satov could never have dreamed was possible, and made the business an attractive acquisition target for larger players in the debt service industry.

8.      As a result of the joint venture, Satov and Dykstra entered into a new contract (the "AMI Contract") that superseded the Brand Ambassador Contract.  Under the AMI Contract, Dykstra obtained a 25% equity stake in Rebound Finance.

9.      The AMI-Rebound Finance joint venture lasted approximately four months. Despite Dykstra's ownership interest in Rebound Finance, Satov refused to provide Dykstra with access to the books and records of Rebound Finance or its performance metrics in connection with its joint venture with AMI.  Without even seeking Dykstra's advice or consent, Satov allowed Defendant Debt.Com, LLC ("Debt.Com") to acquire Rebound Finance and to create a new entity, Rebound Marketing, LLC ("Rebound Marketing"), under which Debt.Com would own 51% and CMI and Dykstra would own 49% of Rebound Marketing.

10.      For his part, Defendant Howard Dvorkin, who is the majority owner of Debt.Com, negotiated the Rebound Marketing deal with Satov.  Dvorkin made no effort whatsoever to deal with Dykstra and simply told Satov that Dykstra's "share of any equity [in Rebound Marketing] would come out of your [CMI's] ownership interest."  Despite numerous requests, none of the principals of Rebound Marketing have provided Dykstra with access to the company's books and records, and Satov has flatly denied that Dykstra owns any equity interest in Rebound Marketing.

11.     Nevertheless, despite leaving Dykstra out in the cold and without Dykstra's permission, Dvorkin and Satov used, and continues to use Dykstra's name and life story to promote Rebound Marketing and to associate him with the brand.  Satov and Dvorkin thus continue to profit off of Dykstra's celebrity, while falsely denying Dykstra's ownership interests and neglecting to compensate him for the name recognition he continues to bring to the Rebound Finance Brand.

12.     For the conduct discussed above, Dykstra brings this action for injunctive and declaratory relief, as well as compensatory and punitive damages.

### PARTIES

13.     Plaintiff LENNY DYKSTRA is a citizen of the state of New Jersey.

14.     Defendant SCOTT SATOV is a citizen of Canada, residing in Toronto, Ontario, Canada.

15.     Defendant 6069321 CANADA INC. is a Canadian Federal Corporation, with its principal place of business in Montreal, Quebec, Canada.  It does business under the names of Credit Marketing International and CMI.  CMI operates www.loanscanada.ca, a leading loan referral and credit network in Canada.

16.     Defendant HOWARD DVORKIN is a citizen of the State of Florida, residing in Broward County.

17.     Defendant DEBT.COM, LLC is a limited liability company organized under the laws of Florida, and operates the website debt.com, which purports to provide "expert advice for getting out – and staying out – of debt," and "match[es] people seeking debt solutions with proven companies they can trust."  (Source: www.debt.com/our-story/).  Upon information and belief, Defendant Howard Dvorkin, through various corporations, is the ultimate equity owner of Debt.Com, LLC.

18.     Defendant REBOUND MARKETING, LLC is a limited liability corporation formed under the laws of the State of Delaware, with its principal place of business in Fort Lauderdale, Florida.  REBOUND MARKETING, LLC is a nominal defendant, named solely for the purpose of effectuating the relief sought in this action.  As a nominal defendant, REBOUND MARKETING, LLC's citizenship is ignored for the purposes of diversity jurisdiction.

## JURISDICTION AND VENUE

19.     The jurisdiction of this Court is based on diversity of citizenship under 28 U.S.C. § 1332, because Plaintiff and the Defendants are citizens of different states and citizens or subjects of a foreign state, and the amount in controversy exceeds the sum or value of $75,000.

20.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to this claim occurred in this district, including that the meetings and communications concerning the AMI-Rebound Finance joint venture occurred in this district.

## FACTUAL ALLEGATIONS

21.     Dykstra is a retired professional baseball player for the New York Mets and Philadelphia Phillies.  During his playing career, Dykstra was an All-Star on three separate occasions and a member of the World Series Champion Mets in 1986.  As a result of his baseball career, Dykstra attained significant wealth and celebrity.

22.     Dykstra's wealth and celebrity increased in the years after his playing career, as he became a well-known business mogul and investment guru.  However, Dykstra suffered significant financial losses during the economic recession in 2008, and he filed for bankruptcy in July 2009.

23.     On June 28, 2016, Dykstra's memoir, "House of Nails," was released.  The memoir detailed the many highs and lows of Dykstra's life, including his successes on the

baseball field, his financial struggles off of it, and his ultimate road to redemption. "House of Nails" was a success upon release, appearing at number eleven on the New York Times nonfiction best-seller list for July 17, 2016, and placing Dykstra back in the national spotlight.

24.     Because of the success of "House of Nails," during the summer of 2016, Satov reached out Dykstra to propose that he become a spokesperson for CMI's business, Rebound Finance.  Through CMI, Satov operated www.loanscanada.ca, one of the leading loan referral and credit networks in Canada.  Satov sought to operate a similar network in the United States through Rebound Finance under the website www.reboundfinance.com.  Satov believed Dykstra's celebrity and background would appeal to Rebound Finance's customer base and help the business grow dramatically.

25.     After months of negotiations, Satov and Dykstra entered into the Brand Ambassador Contract.  The Brand Ambassador Consulting Contract required Dykstra to "be the Brand Ambassador for Rebound" and to "use his celebrity status, social media and general media clout to promote rebound (sic.) and its services whenever possible."  The Brand Ambassador Contract explicitly recognized that Dykstra's celebrity status and personal history was of significant value to Satov, CMI, and Rebound Finance.  The Brand Ambassador Contract explicitly states that because Rebound Finance's "mission is to rehabilitate people with bad or challenged credit, Lenny's financial rehabilitation and social image is a major part of the essence of the contract."

26.     The Brand Ambassador Contract provides that Dykstra is "entitled to a marketing fee equal to 25% of the gross revenue earned by Rebound during the term of the contract."  The term of the Brand Ambassador Contract is defined as "from the signing until Lenny's death, may he RIP."  By its terms, Dykstra was to be paid his share of the gross revenue "net 15 days from

month's end via bank wire or check."  Dykstra, however, never received a single payment of the percentage of gross revenues he was owed under the contract.

27.     After entering into the Brand Ambassador Contract with Dykstra, Satov failed to and refused to take any steps to invest in Rebound Finance or otherwise promote the company, thus restricting Dykstra's ability to earn a living since Dykstra was precluded from marketing financial services for any other company during the life on the contract.  Because of Satov's refusal to promote and invest in Rebound Finance, Dykstra's and Satov's relationship soured; however, the Brand Ambassador Contract remained in effect.

28.     Satov and Dykstra briefly reconciled after Dykstra proposed to Satov an idea to greatly increase Rebound Finance's visibility and connect Rebound Finance to a large and previously untapped customer base.  Specifically, Dykstra proposed to introduce Satov to a close friend and high-ranking executive at AMI to facilitate a joint venture between CMI and AMI under which AMI would provide free advertising for Rebound Finance in AMI's media and print publications, and AMI and CMI would share in Rebound Finance's profits.

29.     From December 2017 through March 2018, Dykstra met with high-level AMI executives and persuaded them of the viability and promise of the proposed business model. Dykstra's tireless efforts led to his arranging several meetings for Satov and other CMI executives with AMI executives.  Those meetings were productive, and CMI and AMI entered into the joint venture that Dykstra had conceived of and made happen, making Satov's dreams and aspirations for Rebound Finance a reality.

30.     On the cusp of the joint venture actually materializing, Satov and Dykstra negotiated the AMI Contract, which superseded their Brand Ambassador Contract.  Under the AMI contract, Dykstra was to be paid a $2,500 consulting fee for introducing Rebound Finance to AMI, as well as a $5,000 signing bonus once the agreement with AMI was executed.  In

addition, Dykstra agreed to exchange his twenty-five percent interest in Rebound Finance's gross revenue for a twenty-five percent ownership stake in Rebound Finance.

31.     AMI's advertising campaign substantially raised the profile of the Rebound Finance brand, drawing the interest of businesspeople in the debt service industry who saw Rebound Finance as a potentially lucrative acquisition target.  One of those businesspeople was Dvorkin, the founder and former president of Consolidated Credit Counseling Services, that advises borrowers on how to reduce their debt.  Although Dvorkin is an outspoken critic of hard money lenders and his websites, including www.debt.com, warn consumers of the dangers of high-interest debt, Dvorkin himself has faced scrutiny in recent years from federal land state law enforcement for his ties to payday lenders.[1]  Notably, while debt.com warns consumers that "no-credit-check installment loans can be risky and expensive," Rebound Finance prominently features its ability to connect consumers to lenders that extend loans "without even checking my credit."[2]

32.     In or about July 2018, without seeking or obtaining Dykstra's advice or consent, Satov negotiated with Dvorkin an acquisition of Rebound Finance and the creation of a new company, Rebound Marketing, which would operate the Rebound Finance brand through the website www.reboundfinance.com.  As Satov and Dvorkin agreed, 51% of Rebound Marketing would be owned by Debt.Com and 49% by CMI and Dykstra.  Neither Dvorkin nor anyone at

---

[1] *See, e.g.*, Rachel Louise Ensign and Jason Zweig, *Investigations Into Businesses Linked to Debt-Relief Advocate Howard Dworkin Intensify: New York probes whether nonprofit directs business to firms owned by Dworkin*, WALL ST. JRNL, Oct. 28, 2016 (available at www.wsj.com/articles/investigations-into-businesses-linked-to-debt-relief-advocate-howard-dvorkin-intensify-1477607031).

[2] *Compare* https://www.debt.com/solutions/loans/personal-loans/, *with* https://reboundfinance.com/en/loans/personal-loans/.

Debt.Com discussed Rebound Finance with Dykstra, and instead told Satov that Dykstra's "share of any equity [will] come out of [CMI's] ownership interests."

33.     Even after Rebound Marketing was formed, and Satov and Dvorkin excluded Dykstra from his rightful interests in the company, the website continues to feature Dykstra's name, image, and life story on the Rebound Marketing website, in Rebound Marketing's advertisements, and in Rebound Marketing's marketing materials.[3]  Despite profiting and otherwise benefitting from exploiting Dykstra's image and fame, neither Satov nor Dvorkin nor CMI nor Debt.Com ever sought or obtained Dykstra's permission and never paid Dykstra for such use of his name, image, and life story.

## CLAIMS FOR RELIEF

COUNT I
Breach of Contract-Brand Ambassador Contract
(against Defendant CMI)

34.     Plaintiff realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

35.     Plaintiff and Defendant CMI entered into the Brand Ambassador Consulting Contract, which was an enforceable contract.

36.     Plaintiff performed his obligations under the Brand Ambassador Consulting Contract according to the terms of the agreement.

37.     Defendant breached the agreement by failing to pay Plaintiff according to the terms of the agreement.

38.     Plaintiff has suffered damages as a result of Defendant CMI's breach.

---

[3] *See* https://reboundfinance.com/en/media/.

COUNT II
Breach of Contract-AMI Contract
(against Defendant CMI)

39.     Plaintiff realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

40.     Plaintiff and Defendant CMI entered into the AMI Contract, which was an enforceable contract.

41.     Plaintiff performed his obligations under the AMI Contract by introducing Defendant Satov to AMI and by facilitating a joint venture between Rebound Finance and AMI.

42.     Defendant breached the AMI Contract by failing to honor Plaintiff's rights as a shareholder in Rebound Finance, by failing to pay Plaintiff the $2,500 consulting fee he earned, by failing to pay Plaintiff the $5,000 signing bonus he earned, and by violating the implied covenant of good faith and fair dealing.

43.     Plaintiff has suffered damages as a result of Defendant CMI's breach.

COUNT III
Breach of Fiduciary Duty of Due Care
(against Defendant CMI and Satov)

44.     Plaintiff realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

45.     As a shareholder of Rebound Finance, Defendant CMI owed Rebound Finance and Plaintiff a duty to conduct the business of Rebound Finance with that degree of care that an ordinarily prudent person in a similar position would use under similar circumstances.

46.     Defendant CMI violated its duty of care to Rebound Finance and Plaintiff by engaging in self-dealing transactions, including the sale of Rebound Finance to Defendant Debt.Com and forming Rebound Marketing, LLC, and neglecting to consult with Plaintiff relating to the conduct of Rebound Finance's business.

47.     Plaintiff has suffered damages as a result of Defendant CMI's conduct.

<u>COUNT III</u>
Breach of Fiduciary Duty of Due Care
(against Defendants CMI and Debt.Com)

48.     Plaintiff realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

49.     As a shareholder of Rebound Marketing, Defendants CMI and Debt.Com owed Rebound Marketing and Plaintiff a duty to conduct the business of Rebound Marketing with that degree of care that an ordinarily prudent person in a similar position would use under similar circumstances.

50.     Defendants CMI and Debt.Com violated their duty of care to Rebound Marketing and Plaintiff by engaging in self-dealing transactions and neglecting to consult with Plaintiff relating to the conduct of Rebound Marketing's business.

51.     Defendants CMI and Debt.Com continue to violate their duties of care to Plaintiff by engaging in self-dealing transactions and neglecting to consult with Plaintiff relating to the conduct of Rebound Marketing's business.

52.     Unless enjoined, Defendants CMI and Debt.Com will continue to engage in the unlawful acts described above.  Plaintiff has no adequate remedy at law.  Plaintiff suffers and will continue to suffer irreparable injury from Defendant CMI and Debt.Com's acts and practices unless relief is provided by this Court.

<u>COUNT IV</u>
Aiding and Abetting
(Against Defendant Satov)

53.     Plaintiff realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

54.     Defendant Satov knowingly and intentionally aided and abetted Defendant CMI's breach of its fiduciary duty to Plaintiff and Rebound Finance.

55.     Plaintiff has suffered damages, and continues to suffer damages as a result of Defendant's conduct.

COUNT V
Aiding and Abetting
(Against Defendants Satov and Dvorkin)

56.     Plaintiff realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

57.     Defendants Satov and Dvorkin knowingly and intentionally aided and abetted Defendants CMI and Debt.Com's breach of their fiduciary duties to Rebound Marketing and Plaintiff, and continue to do so.

58.     Unless enjoined, Defendants CMI and Debt.Com will continue to engage in the unlawful acts described above.  Plaintiff has no adequate remedy at law.  Plaintiff suffers and will continue to suffer irreparable injury from Defendant Satov and Dvorkin's acts and practices unless relief is provided by this Court.

COUNT VI
Tortious Interference With Contractual Relationship
(Against Defendants Debt.Com and Dvorkin)

59.     Plaintiff realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

60.     Defendants Debt.Com and Dvorkin had knowledge of the AMI Contract.

61.     Without reasonable justification or excuse, Defendants Debt.Com and Dvorkin induced Defendant CMI to break its contract with Plaintiff and sell Rebound Finance without seeking or obtaining the advice and consent of Plaintiff.

62.     By reason of that inducement, Plaintiff has sustained damages.

<u>COUNT VII</u>
Promissory Estoppel
(Against Defendants CMI and Satov)

63.     Plaintiff realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

64.     Defendants CMI and Satov made Plaintiff a clear and unambiguous promise that if Plaintiff introduced Satov and CMI to AMI and facilitated a joint venture between CMI and AMI concerning the operation of Rebound Finance, Plaintiff would have a 25% equity stake in Rebound Finance, a $2,500 consulting fee, and a $5,000 signing bonus.

65.     In reliance on the promise of Defendants CMI and Satov, which reliance was reasonably foreseeable, Plaintiff introduced Defendants CMI and Satov to AMI and facilitated a joint venture between CMI and AMI with respect to the operation of Rebound Finance.

66.     Plaintiff has suffered injuries sustained in reliance on the promise of CMI and Satov.

<u>COUNT VIII</u>
Unjust Enrichment
(Against Defendants CMI, Debt.Com, Satov, and Dvorkin)

67.     Plaintiff realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

68.     As a result of Plaintiff's efforts, the CMI-AMI joint venture increased the visibility and marketability of the Rebound Finance business and brand, which attracted Debt.Com and Dvorkin to form Rebound Marketing, in which Debt.Com and CMI were members, and from which Dykstra has been effectively excluded.

69.     Defendants CMI, Debt.Com, Satov, and Dvorkin have profited and continue to profit from the operations of Rebound Marketing.

70.     Under the circumstances, Defendants CMI, Debt.Com, Satov, and Dvorkin had a legal and equitable obligation to account for the property and benefits received as a result of the formation, ownership, and operation of Rebound Marketing.

71.     Defendants CMI, Debt.Com, Satov, and Dvorkin have failed to make restitution of and for the property and benefits they have received from Plaintiff, and, consequently, they have been unduly enriched thereby.

COUNT IX
Tortious Interference With Prospective Economic Advantage
(Against Defendants Debt.Com and Dvorkin)

72.     Plaintiff realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

73.     Defendants CMI and Satov had a business relationship with Plaintiff under which they promised that Plaintiff would have an equity stake in the Rebound Finance business.

74.     Defendants Debt.Com and Dvorkin were aware of that business relationship.

75.     Nevertheless, Defendants Debt.Com and Dvorkin dealt exclusively with CMI and Satov in establishing and operating Rebound Marketing, and excluded Plaintiff from the negotiation, formation, and operation of Rebound Marketing.

76.     In doing so, Defendants Debt.Com and Dvorkin acted with the sole purpose of harming Plaintiff and used dishonest, unfair, and improper means in injuring the business relationship between CMI and Satov, on the one hand, and Plaintiff, on the other.

77.     Plaintiff has suffered damages as a result.

COUNT X
Violation of Right of Privacy under New York Civil Rights Law Section 51
(Against Defendants CMI, Debt.Com, Satov, and Dvorkin)

78.     Plaintiff realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

79.     Defendants CMI, Debt.Com, Satov, and Dvorkin used Plaintiff's name, portrait, and picture for advertising purposes in New York and elsewhere for the purposes of trade without the express written consent of Plaintiff.

80.     Plaintiff has suffered damages thereby.

81.     Unless enjoined, Defendants will continue to use Plaintiff's name, portrait, and picture for advertising purposes in New York and elsewhere for the purposes of trade without Plaintiff's written consent.  Plaintiff has no adequate remedy at law.  Plaintiff suffers and will continue to suffer irreparable injury from Defendants' acts and practices unless relief is provided by this Court.

COUNT XI
Violation of Right of Publicity
(Against Defendants CMI, Debt.Com, Satov, and Dvorkin)

82.     Plaintiff realleges and incorporates by reference paragraphs 1 through 33 as if fully set forth herein.

83.     Defendants CMI, Debt.Com, Satov, and Dvorkin used Plaintiff's name, portrait, picture, and life story for advertising purposes in New York and elsewhere for the purposes of trade without the consent of Plaintiff.

84.     Plaintiff has suffered damages thereby.

85.     Unless enjoined, Defendants will continue to use Plaintiff's name, portrait, and picture for advertising purposes in New York and elsewhere for the purposes of trade without Plaintiff's written consent.  Plaintiff has no adequate remedy at law.  Plaintiff suffers and will continue to suffer irreparable injury from Defendants' acts and practices unless relief is provided by this Court.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks the following relief:

15

A. Compensatory damages to Plaintiff in an amount to be determined at trial for the injuries sustained by Plaintiff as a result of the events alleged herein.

B. Punitive damages against the Defendants in an amount to be determined at trial in order to punish Defendants for their wanton, reckless, and malicious acts, and to protect society against similar acts.

C. A preliminary and permanent injunction:

> (1) requiring Defendants CMI and Satov to provide Plaintiff a full and complete accounting of Rebound Finance's business in connection with the joint venture between CMI and AMI.

> (2) requiring Defendants CMI, Satov, Debt.Com, and Dvorkin to provide Plaintiff a full and complete accounting of Rebound Marketing, and to enable Plaintiff and his auditors to examine Rebound Marketing's books and records;

> (3) prohibiting any transfers of funds, directly or indirectly, from Rebound Marketing to CMI, Satov, Debt.Com, and Dvorkin;

> (4) prohibiting Defendants CMI, Satov, Debt.Com, and Dvorkin from further using, without Plaintiff's written consent, Plaintiff's name, portrait, picture, and life story for any purpose, including advertising or marketing for Rebound Marketing, Rebound Finance, or any other of their businesses.

> (5) Appointing a receiver *pendite lite* for Rebound Marketing whose responsibilities would include ensuring that Defendants CMI, Satov, Debt.Com, and Dvorkin comply with their fiduciary duties to Rebound Marketing and to Plaintiff, with such costs to be paid by Defendants CMI, Satov, Debt.Com, and Dvorkin.

D. A declaration that Plaintiff has membership interests in Rebound Marketing in amount to be determined by the Court based on the evidence presented to the Court,

and no less than an amount equivalent to 25% of the equity stake that CMI held in Rebound Marketing at the inception of Rebound Marketing.

E. An order awarding Plaintiff the costs of this suit, including attorney's fees.

F. An order awarding such other and further relief that this Court deems necessary and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Respectfully submitted,

*Eric Creizman*

Eric M. Creizman (EC-7684)
PIERCE BAINBRIDGE BECK PRICE & HECHT LLP
747 Third Avenue, Suite 2000
New York, New York 10017
Telephone: (212) 972-0200
Facsimile: (646) 200-5022
Email: ecreizman@piercebainbridge.com
*Attorneys for Plaintiff Leonard Dykstra*